## C. F. HARMS CO. v. CORNELL STEAMBOAT CO.

(Circuit Court of Appeals, Second Circuit. April 10, 1918.)

No. 196.

Towage ⬅15(2)—Injuries—Evidence.

   On libel for injuries to a scow while in tow, evidence *held* to warrant a decree for libelant, showing that a collision causing the injury occurred substantially as claimed by libelant, and that the tug in charge of the tow was in fault.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the C. F. Harms Company against the Cornell Steamboat Company. From a decree for libelant, respondent appeals. Affirmed.

This is an appeal from a decree entered on the 19th day of June, 1917, awarding damages for the injury to a scow in tow to the respondent on the 13th day of September, 1916. The tug Williams, with the help of the Primrose, both owned by the respondent, had made up a tow in the North River, consisting originally of some nine boats, had towed them down the North River around the Battery, and was bound up the East River on a flood tide. The theory of the libelant is that their barge, the Crab, which was in the tow, was the tail boat on the starboard tier, and that above the abutments on the Brooklyn shore she was swung by the set of the tide against a barge fastened to the end of the Brooklyn piers and suffered the injuries in question. These injuries consisted of staving in her starboard side above the water line, somewhat forward of amidships. The conceded facts are that soon after the time alleged the helper tug, the Primrose, came to take the Crab out of the tow, and was at that time advised that the scow had been injured in the way now claimed. The question turns wholly upon the facts.

Kirlin, Woolsey & Hickox, of New York City (Robert S. Erskine, of New York City, of counsel), for appellant.

Macklin, Brown & Purdy, of New York City (Pierre M. Brown, of New York City, of counsel), for appellee.

Before WARD and ROGERS, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). The first question in the case is whether there was a collision at all, at least in the way described. The District Judge rested so strongly upon the word of Eliasen, the Crab's bargeman, that he accepted his version of the story against that of six others. A part of it we reject. There is, so far as appears in this record, no set of the flood upon the Brooklyn shore at that place. The river takes a sharp bend to the east just at the Brooklyn Bridge, and the general set of the flood is well known in the harbor to be against the New York shore. There is no current which could account for the swing described by Eliasen, and his explanation cannot be accepted.

There is, however, another explanation of the collision which is possible, if we assume that the Crab was on the starboard tier and that the tow was nearer the Brooklyn shore than 300 feet, which is where the crew of the Williams say she was. At some point between the Manhattan and the Brooklyn bridges the Williams starboarded, to be over on the New York shore in rounding Corlaer's Hook. In so doing necessarily all the traction fell upon the starboard hawser. The tow at once began drawing from its starboard corner, and the tail of the tow necessarily swung to starboard a little. This swing would be increased by the movement of the head of the tow across the river. It was possible that the starboard side of the Crab should thus collide with a boat on the Brooklyn shore, and, though we might more reasonably expect a scraping blow, there might also be a recoil between two boats, both afloat, which would inflict

just the kind of injury that existed. In any case, we do not think this explanation an impossible, or even a very unlikely, one.

We cannot escape the conclusion that the Crab was injured on the trip. No injury was observed when she was put into the tow, and it is conceded that Eliasen complained of the damage as soon as the Primrose came to take him out at Twelfth street. At that time he gave the same explanation as he gives now. It seems to us hardly likely that he should have invented the story of the injury and of how it happened. We must suppose either that it had happened before this trip, or during it in some way which charged him with responsibility. Either possibility is, of course, open; but it seems to us extremely improbable that any collision should have been through his fault, so that he should have felt obliged to fabricate this protection. At least, we are not willing to impute such a purpose to him after the District Judge's finding upon observing him on the stand.

We then come to the question whether the Crab was on the starboard tier or not. The testimony to the contrary divides itself into three classes. First, Meeks, the master of the Williams, and Grimes, who was apparently the pilot, but was off watch at the time of the accident, say that she was on the port tier. Meeks only heard of the accident several days after it occurred (folio 119), and he and Grimes "studied it out" between them (folio 120) at that time. There was no contemporaneous written evidence of how the boats were arranged in the tow, and these men were towing different barges every day. When they got together, several days after the accident, and "studied it out together," their recollection could not have been of any great value, especially in view of the strong bias they had at that time, being together in charge of the Williams.

Next is the testimony of the bargemen, Driman and Norris. Driman, on the Burns, said that the Crab had out no fasts to the boat ahead, but towed by a line from her starboard corner to his port midships bitt. This made her swing about, nearly breaking in his windows and causing him anxiety all night long, so that he stayed up to protect his family. This is certainly apocryphal. The Crab had lines, and would not have towed in so absurd a fashion. Norris, the man on board the barge Clark, ahead of the Burns, certainly knew nothing about the whole thing, for he says that they passed under the Brooklyn Bridge at midnight, and had taken seven hours to go to Twelfth street from under the Brooklyn Bridge. Whether he was deliberately telling an untruth, or was merely a confused and ignorant man, we cannot tell.

The third class is made up of Gary and Cunningham, the master and pilot of the Primrose, who also put the Crab in the port tier. They learned of the collision at once, and it may well be urged that it was more impressed upon them than upon Meeks and Grimes. However, they did not think it of enough importance to report to Meeks, and it is always possible that their recollections of it should be made after the event, in conjunction with Meeks and Grimes. This possibility in no way imputes to them any personal dishonesty. The composition of a single tow in the minds of men daily making them up,

shifting about boats here and there, which they see to-day and never again, must be a fleeting impression. It seems to us significant that apparently, when Meeks came to fix the position of the Crab, he did not get it from Gary and Cunningham, but worked it out with Grimes. Nothing is more natural than that all should have come to a common conclusion touching a matter upon which bias was inevitable.

While we cannot but be impressed with the numerical preponderance of witnesses, we cannot say that the District Judge must have accepted the side with the greater array. The mere fact of the injury weighs greatly with us, as with him, and corroborates the only reasonable explanation that has been offered.

Decree affirmed, with costs.